UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| DELTA PHONES, INC., | ) | No. 04 B 823 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| RONALD R. PETERSON, not individually, but solely as the trustee of the bankruptcy estate of Delta Phones, Inc., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 05 A 1205 |
| E. LEE HOFMANN, STEVEN WICKER, and HOFCOM, L.L.C., | ) ) ) ) | |
| Defendants. | ) | Judge Goldgar |

## MEMORANDUM OPINION

According to chapter 7 trustee Ronald Peterson, two Illinois businessmen, Fallean Mintz and Richard Tolan, spent the last five years orchestrating a massive fraudulent scheme that entailed acquiring control of local retail phone companies. In 2002, as part of this scheme, Mintz and Tolan sought to acquire Delta Phones, Inc. To come up with the purchase price, a company apparently controlled by Mintz and Tolan, M&T, LLC, obtained a $1.6 million loan from Hofcom, LLC, operated by E. Lee Hofmann and Steven Wicker. Hofcom, in turn, obtained the funds to make the loan from First Capital Bank. After the acquisition, M&T (through Delta Phones) repaid Hofcom, and Hofcom transferred most of the payments to First Capital.

On January 8, 2004, Delta Phones sought protection under chapter 11 of the Bankruptcy Code. The case was later converted to chapter 7, and Ronald Peterson was appointed chapter 7

Trustee. Peterson then filed an adversary complaint against Hofcom, Hofmann and Wicker to recover Delta Phones' payments to Hofcom under section 550(a)(1) of the Bankruptcy Code. Counts I through VI of the complaint allege that the payments were fraudulent transfers under federal and state law and are recoverable from the defendants. Count VII seeks to disallow the claims of the defendants against the estate under section 502(d).

Shortly after the complaint was filed, Wicker and Hofmann (but not Hofcom) moved for summary judgment on all counts, contending they are not liable under section 550(a)(1) either as "initial transferee[s]" of Delta Phones or as entities "for whose benefit such transfer[s] [were] made." 11 U.S.C. § 550(a)(1). In response, Peterson argues that the undisputed facts establish the liability of both Wicker and Hofmann under section 550(a)(1). Alternatively, Peterson invokes Rule 56(f) and requests time for additional discovery on a new theory of liability he offers for the first time on summary judgment.

For the reasons set forth below, Peterson will be permitted to amend his complaint and allege his new theory. The summary judgment motion will be continued to see if Peterson amends. If he does not, summary judgment will be entered in favor of Hofmann and Wicker.

### 1. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(b) and the district court's Internal Operating Procedure 15(a). This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(H) and (O). The court may therefore enter a final judgment. *In re Smith*, 848 F.2d 813, 816 (7th Cir. 1988).

### 2. Facts

The pleadings and summary judgment materials reveal the following facts. No material

facts are disputed.

In 2002, Fallean Mintz and Richard Tolan offered to purchase Delta Phones, Inc. from its owner. (P. 7056-2 Resp. ¶ 9). Delta Phones was a corporation located in Louisiana that provided prepaid retail telephone service over telephone lines provisioned by independent local exchange corporations. (Answer to Compl., ¶ 17). Around the time of their offer, Mintz and Tolan met with E. Lee Hofmann and Steven Wicker, two central Illinois businessmen, to discuss the purchase. (Answer to Compl., ¶ 20; P. 7056-2 Resp. at ¶¶ 3-4).

Mintz and Tolan told Hofmann and Wicker they needed a partner to fund $1.6 million of the purchase price. (*Id.*) Hofmann and Wicker agreed to fund this amount through Hofcom, LLC, an Illinois limited liability company.[1] (Answer to Compl., ¶¶ 4, 22). M&T, LLC, a Delaware limited liability company of which Mintz and Tolan were apparently managers, then executed a loan agreement with Hofcom for $1.6 million. (Answer to Compl., ¶ 22). In consideration for the loan, M&T gave Hofcom a note bearing 17% interest, a 15% equity interest in Delta Phones, and the right to certain residual income of Delta Phones. (Answer to Compl., ¶ 20 and Ex. A to Compl.). Mintz and Tolan personally guaranteed M&T's $1.6 million obligation to Hofcom. (P. 7056-2 Resp. at ¶ 9).

Hofcom obtained the money for the loan to M&T from First Capital Bank (D. 7056-1 Resp. ¶¶ 1-2), a financial institution in Peoria, Illinois (D. 7056-1 Stmt. ¶ 11). The defendants knew First Capital well. Hofmann had served on the board of directors of First Capital since 2000 and had also served on its loan committee. (D. 7056-2 Resp. ¶ 2). Wicker was employed at First Capital from 1998 to 2000 as a Manager of Electronic Banking. (*Id.*). Hofmann

---

[1] According to the defendants, Wicker owns 10% of Hofcom. (D. 7056-1 Stmt. ¶ 2). International Supply Co., a company of which Hofmann is majority shareholder (as well as president and C.E.O), owns the other 90%. (D. 7056-1 Stmt. ¶ 3).

personally guaranteed the loan from First Capital to Hofcom. (D. 7056-2 Resp. ¶ 1).

On December 20, 2002, in accordance with the Hofcom-M&T agreement, Hofcom transferred $1.6 million to Delta Phones. (P. 7056-2 Resp. ¶ 11). Delta Phones then wired the funds to the owner of Delta Phones. (*Id.*). That same day, M&T received 90% of Delta Phones' outstanding stock. (*Id.*). M&T later transferred 15% of the stock to Hofcom. (*Id.*).

From January 21 to July 18, 2003, Delta Phones made seven payments to Hofcom totaling $1,925,000 — approximately one payment per month, each in the amount of $275,000. (P. 7056-2 Resp. ¶¶ 12-18). According to Hofmann and Wicker, within three days of receiving each payment Hofcom would transfer an amount equal or close to $275,000 to First Capital (D. 7056-1 Stmt. ¶¶ 12-18), a total of $1,699,553.15 (P. 7056-1 Resp. ¶ 4). On December 19, 2004, about six months after it made its last $275,000 transfer, Delta Phones transferred $23,000 more to Hofcom. (Answer to Compl., at ¶ 25).

Ignoring this last $23,000 transfer (which the parties do not discuss), the difference between the amount Delta Phones paid to Hofcom and the amount Hofcom then paid to First Capital was $255,466.84. (P. 7056-1 Resp. ¶ 4). The disposition of this money is unexplained. Peterson notes that between January and December 2003, Hofcom issued checks to International Supply, Hofmann, Wicker, relatives of Hofmann, and other companies Hofmann and Wicker owned and controlled. (P. 7056-2 Stmt. ¶ 10). Peterson implies that the checks represented transfers of the $255,466.84. Hofmann and Wicker admit that checks were issued but deny Peterson's implication. (D. 7056-1 Resp. ¶ 10).

## 2. Discussion

On the complaint as it stands and on the evidence presented, Hofmann and Wicker are entitled to summary judgment: neither is liable to Peterson under section 550(a)(1). In his

response, however, Peterson has requested more time for discovery under Rule 56(f) and has raised a new theory. He suggests that Hofcom was merely the alter ego of Hofmann and Wicker. Under this theory, Hofmann and Wicker could be liable under section 550(a)(1) as "initial transferees." Although Peterson mentions this theory for the first time on summary judgment, he will be given leave under Rule 15(a) to amend his complaint and allege it. If he amends, the motion for summary judgment will be denied. If he does not, the motion will be granted.

### a. Summary Judgment

The summary judgment standard under Rule 56 is familiar. Fed. R. Civ. P. 56 (made applicable by Fed. R. Bankr. R. 7056). On a motion for summary judgment, "the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (internal quotation omitted). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (internal quotation omitted). When a defendant moves for summary judgment, consequently, the plaintiff has the obligation to make out a prima facie case. To do so, the plaintiff must adduce evidence on every element of his claim on which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Failing that, summary judgment will be entered for the defendant. *See, e.g., Brummet v. Sinclair Broad. Group*, 414 F.3d 686, 694 (7th Cir. 2005).

### b. The Complaint As It Is

### i. Liability As "Initial Transferees"

On the complaint as filed, Hofmann and Wicker are entitled to summary judgment because they were not "initial transferees" of the Delta Phones loan payments.

Sections 544 and 548 of the Bankruptcy Code enable a trustee to avoid certain pre-petition property transfers that are fraudulent under state or federal law. 11 U.S.C. §§ 544, 548; *see Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 586-87 (Bankr. N.D. Ill. 2005). Section 550 specifies the parties from whom fraudulent transfers can be recovered. Under section 550(a)(1), the trustee can recover a transfer from the "initial transferee." 11 U.S.C. § 550(a)(1). Although the Code does not define "transferee," *Bonded Fin. Serv. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988), explains that a "transferee" has "dominion over the money or other asset, the right to put the money to one's own purposes." *Id.* at 893. The "initial" transferee is the first entity to have such a dominion or right. *Kepler v. Aetna Fin. Co. (In re Ausman Jewelers, Inc.)*, 177 B.R. 282, 286 (Bankr. W.D. Wis. 1995).

Hofmann and Wicker were not "initial transferees" of the Delta Phones loan payments. It is undisputed that Delta Phones made the payments to Hofcom, not to Hofmann or Wicker individually. Moreover, Peterson adduces no evidence that Delta Phones placed any restrictions on how Hofcom used the money. As far as Delta Phones was concerned, apparently, Hofcom did not have to pay anything to First Capital, Hofmann, or Wicker, but could have invested "the whole [amount] in lottery tickets or uranium stocks." *Bonded*, 838 F.2d at 894. Because Hofcom was the first to receive the payments and had dominion over the money   the right to

-6-

use the funds as it pleased. Hofcom, not Hofmann or Wicker, was the "initial transferee."[2] *Id.* at 893.

Peterson, however, contends that Hofcom was merely an "agent" of Hofmann and Wicker. As such, he says, Hofcom can be disregarded, and Hofmann and Wicker can be considered the "initial transferees" of the Delta Phones payments.

Peterson is mistaken. True enough, a party holding property "only for the purpose of fulfilling an instruction to make the [property] available to someone else" is not a transferee, but an intermediary. *Bonded,* 838 F.2d at 893; *see also Daley v. Chang (In re Joy Recovery Tech. Corp.),* 286 B.R. 54, 80 (Bankr. N.D. Ill. 2002). Had Hofcom been under orders from Delta Phones to hand the payments over to Hofmann and Wicker, Hofmann and Wicker would have been the "initial transferees" and Hofcom merely their agent. *See Bonded,* 838 F.2d at 893-94 (holding bank an "agent" and not "initial transferee" where debtor directed bank to apply funds payment to a particular account). But there is no evidence of such orders here. As far as the record shows, Hofcom was free to use the payments as it saw fit. Hofcom was no "mere conduit" in this transaction. *Leonard v. First Commercial Mortgage Co. (In re Circuit Alliance, Inc.),* 228 B.R. 225, 232-33 (Bankr. D. Minn. 1998) (noting that "an entity that is in possession of transferred funds as a 'mere conduit' . . . is not a 'transferee'").

Because Hofcom was the "initial transferee," Hofmann and Wicker cannot be liable to Peterson as "initial transferees" under section 550(a)(1).

---

[2]    Hofmann and Wicker admit in their papers that Hofcom was the "initial transferee." (D. Mem. at 6). In doing so, they may mean to concede Hofcom's section 550(a)(1) liability to Peterson. Whether Hofcom concedes its own liability is another matter. (*See* Answer, Fourth Aff. Defense (asserting that Hofcom "was not an initial or subsequent transferee within the meaning of 11 U.S.C. § 550(a)")). The pending motion does not involve Hofcom.

### ii. Liability As "Entities for Whose Benefit Such Transfer Was Made"

Hofmann and Wicker are also not liable to Peterson under section 550(a)(1) as entities for whose benefit the Delta Phones payments were made.

Under section 550(a)(1), a trustee can recover a fraudulent transfer, not only from the initial transferee, but also from "the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1). An "entity for whose benefit such transfer was made" is a "person who receives a benefit from the initial transfer." *Bonded*, 838 F.2d at 896; *see also Danning v. Miller (In re Bullion Reserve of N. Am.)*, 922 F.2d 544, 547 (9th Cir. 1991). The classic example, not surprisingly, is "a guarantor or debtor – someone who receives the benefit but not the money." *Bonded*, 838 F.2d at 895. The guarantor benefits from the initial transfer because the transfer has the effect of reducing his obligation on the guaranty. *Id.*; *see also McCook*, 319 B.R. at 590 (noting that a typical "transfer beneficiary" is "a party whose indemnification obligations or whose own debts are extinguished or reduced by the transfer").

Hofmann and Wicker did not receive a benefit from Delta Phones' payments to Hofcom any more than they received the payments themselves. No evidence shows that the payments reduced financial obligations of Hofmann and Wicker – not an "indemnification obligation" under a guaranty, *McCook*, 319 B.R. at 590, or any other obligation. Delta Phones' payments reduced M&T's obligations to Hofcom, as well as the obligations of Mintz and Tolan who had guaranteed the Hofcom loan. M&T, Mintz and Tolan were therefore entities "for whose benefit" the transfers were made. But Hofmann and Wicker were not.

Peterson disputes this conclusion for several reasons. First, he argues, Hofmann and Wicker received the sort of "benefit" section 550(a)(1) requires because they guaranteed the loan from First Capital to Hofcom.

-8-

Not so. Hofmann (at least) guaranteed the First Capital loan, and so Hofmann (at least) benefitted from payments Hofcom made to First Capital. Those payments, however, were subsequent transfers of the Delta Phones payments, not initial transfers. Section 550(a)(1) extends liability only to an entity who benefits from "such transfer," meaning "the *initial* transfer." *Bonded*, 838 F.2d at 896 (noting that "only a person who receives a benefit from the initial transfer is within this language") (emphasis added). The initial transfer is the first transfer from the debtor to the "initial transferee." *Kepler*, 177 B.R. at 286. Here, the initial transfers were the payments Delta Phones made to Hofcom, not the subsequent payments Hofcom made to First Capital. Although Hofmann had guaranteed the First Capital loan and benefitted when Hofcom used Delta Phones' payments to repay First Capital, that benefit is irrelevant. For purposes of section 550(a)(1), "[t]he benefit must derive directly from the [initial] transfer, not from the use to which it is put by the transferee." *Turner v. Phoenix Fin., L.L.C. (In re Imageset)*, 299 B.R. 709, 718 (Bankr. D. Me. 2003).

Peterson next asserts that even if the initial transfers did not reduce Hoffman and Wicker's financial obligations, the two men benefitted in other ways. He argues that when Delta Phones repaid the Hofcom loan, Hofmann and Wicker benefitted because Hofcom was able to repay the First Capital loan. And when Hofcom repaid the First Capital loan, Hofmann and Wicker benefitted again because Hofcom shed a liability. In both instances, he says the value of their interests as members of Hofcom increased.

The argument is unconvincing because it has no factual support. Peterson produces no evidence – no documents, testimony, or anything else – showing that repayment of either the Delta Phones loan or the First Capital loan had any effect on Hofmann and Wicker's interests in

-9-

Hofcom.[3/] The inference Peterson would draw is speculation. On summary judgment, Peterson is entitled as the non-movant to all reasonable inferences from the facts but not "every conceivable inference," *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997), and inferences based on mere speculation are never reasonable, *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931-32 (7th Cir. 1995). To avoid summary judgment, Peterson had to produce "more than flights of fancy, speculations, hunches, intuitions, or rumors." *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994). He has not done so.

Peterson's argument is incorrect as a matter of law in any event. That a shareholder holds some ownership interest in a corporation does not somehow mean that all transfers made to the corporation or by it are automatically made for the "benefit" of the shareholder under section 550(a)(1). The "entity" under section 550(a)(1) must benefit from the transfer "directly," not indirectly. *Imageset*, 299 B.R. at 718 (holding that members' interests in limited liability company were insufficient to render them liable under section 550(a)(1) as beneficiaries of transfers made to the LLC). Taken to its logical conclusion, Peterson's position would put average investors on the hook for all kinds of corporate transactions any time a public company sought bankruptcy protection. *Id.* (noting the startling implications of the view that shareholders "benefit" from corporate transfers). Peterson offers no authority for his position.[4/]

---

[3/] It is worth recalling that Hofmann himself had no direct interest in Hofcom, at least according to the defendants. The 90% of Hofcom that Wicker did not own was owned by International Supply Co., a corporation of which Hofmann is said to be the majority shareholder. (D. 7056-1 Stmt. ¶ 3).

[4/] Peterson could have cited *McCook* on this point. (He cites it for other points but not this one.) *McCook* sets out a three-part test under which a transfer beneficiary receives the requisite "benefit" if the benefit is actually received by the beneficiary, is quantifiable, and is accessible to the beneficiary. *McCook*, 319 B.R. at 590. In discussing this last element, *McCook* suggests that a person's "control" of a corporate transferee is enough to make the benefit from the transfer accessible to him and so turn that person into an entity "for whose

-10-

Peterson next suggests yet another sort of benefit. He notes that Hofmann and Wicker were connected with First Capital — Hofmann as a director of First Capital and member of its loan committee, Wicker as a former employee, and both men as bank customers. Peterson theorizes that Hofmann and Wicker benefitted for purposes of section 550(a)(1) because their standing with First Capital improved when Hofcom repaid its loan.

This argument is no more convincing than the last. Peterson offers no evidence to support his argument, simply speculating that Hofcom's repayment of the First Capital loan must somehow have raised Hofmann and Wicker in First Capital's eyes. Again, speculation is no substitute for evidence on summary judgment. *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 591 (7th Cir. 1997). Even if it were more than just speculative, though, this point is also meritless. The benefit Peterson posits would not have come about as a result of the initial transfers from Delta Phones to Hofcom. It would have resulted from the subsequent transfers Hofcom made to First Capital. But the "benefit" for purposes of section 550(a)(1), it bears repeating, must come from the initial transfer, not from subsequent transfers. *Bonded*, 838 F.2d at 896. Even if Hofcom's payments to First Capital had produced the very benefit Peterson claims, that benefit would not make Hofmann and Wicker liable.

In support of his section 550(a)(1) "benefit" theory, finally, Peterson offers what he believes to be a more quantifiable "benefit." According to Peterson, bank records show that

---

benefit such transfer is made." *See id.* at 592. In making this suggestion, however, *McCook* does not define "control," and so the decision appears not to limit "control" to alter ego situations. If that is what *McCook* means, the test renders every majority shareholder of a closely-held corporation (to take one example) liable for transfers to the corporation, although the corporation is entirely legitimate and all corporate formalities have been carefully observed. In seeming to approve this result, *McCook* fails to gives corporate form — the critical legal distinction between corporations and their directors, officers, and shareholders — its due. Something more than mere "control" must be shown.

Hofcom made payments to Hofmann, Wicker, and their families from the money it received from Delta Phones, perhaps as much as $255,466.84 – the difference between what Delta Phones paid Hofcom and what Hofcom paid First Capital.

This final argument is flawed, as well. Although the bank records may reflect that Hofcom issued checks to the parties Peterson claims, no evidence ties those checks to the Delta Phones loan payments. No evidence suggests that the checks represented transfers of funds received from Delta Phones instead of other funds. Like so many of his arguments, this argument depends on speculation, and speculation will not do. *Phillips*, 123 F.3d at 591; *Hedberg*, 47 F.3d at 931-32. Even if there facts to support it, moreover, Peterson's theory would be deficient as a legal matter. Had the payments to Hofmann and Wicker in fact been transfers of monies Hofcom received from Delta Phones, Hofmann and Wicker would have been subsequent transferees. A "subsequent transferee" is never an "entity for whose benefit such transfer was made." *Bonded*, 838 F.2d at 896.

On the current record, then, Hofmann and Wicker were not "entities for whose benefit the transfers were made" any more than they were "initial transferees." Hofmann and Wicker are entitled to summary judgment – on the complaint as it stands.

### c. The Complaint As It Might Be

Apparently recognizing the problems with his claims, Peterson advances a new theory on summary judgment. He asserts that Hofcom is a sham – a "shell corporation" that is no more than the alter ego of Hofmann and Wicker. If correct on this score, Peterson would be able to substitute Hofmann and Wicker for Hofcom in his section 550(a)(1) calculus. He could then maintain that the loan payments from Delta Phones to Hofcom were really transfers to Hofmann

and Wicker, making Hofmann and Wicker "initial transferees" liable under that section.[5] *Cf. Cuthill v. Kime (In re Evergreen Sec., Ltd.)*, 319 B.R. 245, 255-56 (Bankr. M.D. Fla. 2003) (assuming viability of theory but holding plaintiff failed to meet burden of proof); *Carolyn's Kitchen, Inc. v. Cybergenics Corp. (In re Carolyn's Kitchen, Inc.)*, 209 B.R. 204, 208-09 (Bankr. N.D. Tex. 1997) (same).

Peterson is already able to offer some evidence tending to support his alter ego claim – that Hofcom may not have been adequately capitalized, for example, and that it may have failed to maintain adequate records and observe legal formalities. Rather than defend on this basis now, however, Peterson has invoked Rule 56(f), which protects a party opposing summary judgment who for valid reasons cannot present "facts essential to justify . . . opposition" to the motion. Fed. R. Civ. P. 56(f). Peterson has submitted the required supporting affidavit, *see id.*, in which he requests an opportunity to take discovery on his alter ego claim, an opportunity he says he has not yet had. *See Farmer v. Brennan*, 81 F.3d 1444, 1449 (7th Cir. 1996) (noting that need for further discovery is legitimate reason under Rule 56(f) to postpone summary judgment).

To this, Wicker and Hofmann have two rejoinders. First, they complain that Peterson has been too slow in pursuing discovery. If he needs more time, they say, it is his own fault and no reason to postpone summary judgment. Second, Hofmann and Wicker note that the complaint alleges no alter ego claim in any event. Therefore, there is nothing to which additional discovery on the subject could possibly be relevant.

---

[5] The situation is actually a bit more complex. As discussed earlier, Hofmann had no direct interest in Hofcom, at least according to the defendants. Wicker owned 10% of Hofcom, International Supply owned the remaining 90%, and Hofmann's connection to Hofcom came through his ownership interest in International Supply. To prevail against Hofmann, then, Peterson would have to pierce the corporate veil twice: once with Hofcom to reach International Supply, and a second time with International Supply to reach Hofmann.

The first point is unpersuasive. Peterson filed his complaint initiating this adversary proceeding on April 15, 2005. Hofmann and Wicker did not appear until May 31 and did not answer until June 17. On August 5, they filed their summary judgment motion. The six-week gap between answer and motion allowed virtually no time for Peterson to take discovery, and he had little more time to do anything meaningful before his response to the motion had to be filed in October. Although Rule 56(b) permits a defendant to move for summary judgment "at any time," Fed. R. Civ. P. 56(b), discovery before summary judgment is strongly favored, *Bank of Am. v. Outboard Marine Corp. (In re Outboard Marine Corp.)*, 304 B.R. 844, 852-53 (Bankr. N.D. Ill. 2004), and a defendant who strikes too quickly under Rule 56 takes the chance that his opponent will invoke Rule 56(f). If that happens, the movant is not in much of a position to complain. When Hofmann and Wicker filed their summary judgment motion, no discovery cut-off had even been set. There is still no cut-off.

The other point – that Peterson has alleged no alter ego claim – has rather more force. Hofmann and Wicker are right that Peterson's complaint nowhere identifies Hofcom as their alter ego. Although notice-pleading under Rule 8 does not demand much, *see Johnson v. Wattenbarger*, 361 F.3d 991, 994 (7th Cir. 2004), it does require a plaintiff to plead *something*. That something is "the bare minimum facts necessary to put the defendant on notice of the claim so that he can file an answer." *Lekas v. Briley*, 405 F.3d 602, 606 (7th Cir. 2005) (internal quotation omitted); *see also Mannheim Auto. Fin. Servs. v. Park (In re Park)*, 314 B.R. 378, 384 (Bankr. N.D. Ill. 2004). Nothing in the complaint here even hints, let alone gives notice, that Peterson is pursuing an alter ego claim.

This defect, though, is not fatal. The Rules specifically contemplate that a plaintiff may come up with a different theory after – sometimes long after – his complaint is filed. Under Rule

-14-

15(a), Fed. R. Civ. P. 15 (made applicable by Fed. R. Bankr. P. 7015), a party may amend his complaint with leave of court to change legal theories or add new ones. 6 C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1474 at 536 (1990). Leave to amend may be granted even after a motion for summary judgment has been filed, provided the requirements of Rule 15(a) are met. *See Verhein v. South Bend Lathe, Inc.*, 598 F.2d 1061, 1063 (7th Cir. 1979) (noting that "[a] party is free to move for leave to amend, even after a motion for summary judgment has been made by the opposing party, and the ordinary standards of Rule 15(a), Fed. R. Civ. P., apply to the court's determination whether to allow the amendment").

Because the "spirit of the Federal Rules" is to ensure "decisions on the merits," *Foman v. Davis*, 371 U.S. 178, 181 (1962), the Rules reflect "a liberal attitude towards the amendment of pleadings," *Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 849 (7th Cir. 2002); *see also In re Stavriotis*, 977 F.2d 1202, 1204 (7th Cir. 1992). Rule 15(a) instructs that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). In accordance with this instruction, a party should be allowed to amend in the absence of some "apparent or declared reason" not to allow it — reasons like undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility of the amendment. *Foman*, 371 U.S. at 182; *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 792 (7th Cir. 2004); *Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 773 (7th Cir. 1995).

None of these common reasons for denying leave to amend applies here. The only two that might arguably apply are undue delay on the part of Peterson and undue prejudice to Hofmann and Wicker. Any delay here, however, has been minimal. The action is only eight months old, and the parties have been at issue for only six of those months. Hofmann and Wicker sought summary judgment just weeks after filing their answer, and the parties have been

occupied briefing the motion ever since. Whatever delay has occurred is understandable; it is hardly "undue." Delay standing alone is rarely a reason to deny leave to amend in any event. *Dubicz*, 377 F.3d at 792.

As for prejudice to Hofmann and Wicker, it is hard to see what sort of prejudice they will suffer from an amendment to Peterson's complaint. Certainly, an amended complaint will mean some additional discovery, some additional cost, and a concomitant delay in resolution of the case. But that prejudice is not particularly substantial and, like the delay in amending, is not "undue." *Foman*, 371 U.S. at 182. To the extent they suffer some prejudice, Hofmann and Wicker brought it on themselves by seeking summary judgment right out of the box, only four months into the litigation and with discovery just underway. *Cf. Dubicz*, 377 F.3d at 793 n.1 (discounting claim of prejudice where litigation had "never progressed beyond the pleadings stage"). Although they were entitled to move for summary judgment "at any time," Fed. R. Civ. P. 56(b), moving when they did ran the risk that the motion would simply change the course of the litigation rather than end it.

Peterson is entitled to amend although he first raised his alter ego claim on summary judgment. This circuit usually frowns on amendments sought in response to summary judgment motions. *See, e.g., Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 861-62 (7th Cir. 2001); *Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996); *Sanders*, 56 F.3d at 774-75 (citing cases). In these and other cases, however, both the summary judgment motion and the resulting request to amend came after discovery had closed. *See, e.g., Bethany*, 241 F.3d at 861; *Speer*, 123 F.3d at 665; *Sanders*,

56 F.3d at 775; *Shanahan*, 82 F.3d at 781.[b/] Discovery had not closed when Hofmann and Wicker filed their motion. It had barely begun. Discovery still is not closed. Although there "must be a point when a plaintiff makes a commitment to the theory of its case," *Johnson v. Methodist Med. Ctr. of Ill.*, 10 F.3d 1300, 1304 (7th Cir. 1993), that point has not arrived here.

Peterson may also amend though he has not asked leave to do so. (He raises his new claim in his memorandum and requests time for discovery, but that is it.) Rule 15(a) says only that a party needs "leave of court" to amend once the time to amend as a matter of course has passed. The Rule says nothing about asking for leave. Parties typically do ask, and leave can be denied if they do not, *see Coates v. Illinois State Bd. of Educ.*, 559 F.2d 445, 451 (7th Cir. 1977), but a court need not stand on formalities. To further the policy of Rule 15(a), a court can grant leave to amend "on its own initiative." 6 C. Wright, A. Miller & M. Kane, *supra*, § 1473 at 521-22; *see, e.g., Homes by Michelle, Inc. v. Federal Sav. Bank*, 733 F. Supp. 1495, 1500 n.7 (N.D. Ga. 1990) (stating that even without a request, the court would "consider possible amendments sua sponte" before dismissal).

Because Peterson has raised a theory on which Hofmann and Wicker might be liable under section 550(a)(1) as "initial transferees," and because Peterson is entitled to amend his complaint under Rule 15(a) to allege the new theory, the court on its own motion will grant Peterson leave to amend the complaint and take discovery on the claim.

---

[b/]   These decisions are consistent with *Verhein* although *Verhein* says that a party may move for leave to amend "even after a motion for summary judgment has been made." *Verhein*, 598 F.2d at 1063. *Verhein* also says that "the ordinary standards of Rule 15(a)" govern the "determination of whether to allow amendment." *Id.* Under those standards, leave to amend may be denied for "undue delay" on the part of the plaintiff and "undue prejudice" to the defendant. *Foman*, 371 U.S. at 182. The decisions disapproving post-summary judgment, post-close of discovery efforts to amend find undue delay, undue prejudice, or both. *See, e.g., Bethany*, 241 F.3d at 861 (finding undue delay); *Shanahan*, 82 F.3d at 781 (deeming request "untimely"); *Sanders*, 56 F.3d at 774 (holding request "unduly delayed and prejudicial").

### 3. Conclusion

The motion of defendants E. Lee Hofmann and Steven Wicker for summary judgment on the complaint of plaintiff Ronald R. Peterson is continued to January 23, 2006, at 10:00 a.m. Peterson is granted leave to file an amended complaint by January 18, 2006, alleging that defendant Hofcom, LLC, is the alter ego of Hofmann and Wicker. If an amended complaint alleging this claim is filed, the motion for summary judgment will be denied. If an amended complaint is not filed, the motion for summary judgment will be granted. A separate order will be entered in accordance with this opinion.

Dated: December 23, 2006

A. Benjamin Goldgar
United States Bankruptcy Judge